# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KURT C. BRYSON, and | ) | |
| CHRISTOPHER G. CONNELLY, SR., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 17-133 (JFB/SRF) |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF WILMINGTON, a | ) | |
| municipal corporation, and | ) | MEMORANDUM AND ORDER |
| BOBBY CUMMINGS, | ) | |
| in his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants City of Wilmington's ("the City") and Bobby Cummings's ("Chief Cummings") motions for summary judgment (D.I. 60 and D.I. 61). This is an action for unlawful reverse race discrimination, disability discrimination, and retaliation in employment. [1] The plaintiffs, former Police Officers of the Wilmington Police Department ("WPD") assert claims for violations of their Equal Protection and Due Process rights under 42 U.S.C. §§ 1981 and 1983, reverse race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and retaliation in violation the Delaware Whistleblowers' Protection Act ("WPA"), 19 Del. C. § 1701 *et seq.*

---

[1] Also pending are stipulations regarding deadlines for *Daubert* motions and motions in limine (D.I. 80 and 81). The stipulated dates have now passed and the motions are moot. The parties have also filed several motions in limine (D.I. 83, 84, 85, 89, 90 and 91). In light of the Court's disposition, those motions will also be denied as moot.

I.    BACKGROUND

The plaintiffs, both Caucasian, are former Wilmington Police Department ("WPD") police officers.  They allege that the City and chief Cummings, its African-American Police Chief, denied their requests for reinstatement because of their race.  They allege that minorities have been reinstated whereas Caucasian officers have not.  Both plaintiffs also assert a procedural due process claim against the City based on alleged deprivation of their property interest in employment.  In addition, plaintiff Bryso, alleges he was denied reinstatement on the basis of a perceived disability.  Plaintiff Connelly additionally asserts a whistleblower retaliation claim, contending he was denied reinstatement for reporting other police officers' misconduct, which is a protected activity under the WPA.

Chief Cummings and the City move for summary judgment.  They first challenge the plaintiffs' procedural due process claims against the City, arguing that the plaintiffs have no constitutionally protected property interest in re-employment as police officers based on custom or practice.[2]  Next, they argue that the plaintiffs' race discrimination claims fail as a matter of law because the factual record does not support an inference of discrimination.    Further, they assert that the defendants have articulated a nondiscriminatory reason for not reinstating the plaintiffs—hiring new officers from a previously recruited class in the Spring of 2016—and they argue that the plaintiffs have not shown the articulated reason is a pretext.    Further, they argue that there is no

---

[2] In ruling on the defendants' motion to dismiss, the Court found the terms of the directive did not confer a protected property interest in reinstatement to the plaintiffs.  D.I. 19, Memorandum and Order at 6.  The Court found the language in directive 5.3A provides a method for reinstatement within one year but did not mandate reinstatement—it did not meaningfully channel official discretion by mandating a defined administrative outcome so as to create a legitimate entitlement to reinstatement.  *Id.*  The Court did find, however, that the plaintiffs' procedural due process claim could proceed on the theory that the City had a custom or practice of reinstatement.  *Id.* at 6-7.

evidence that minorities were treated more favorably than white males. Chief Cummings also asserts he is entitled to qualified immunity because he has discretion to "exercise the effective performance of Police" under Police Directive 1.2 (D.I. 64-1, Ex. 1A) In response, the plaintiffs argue that genuine issues of material fact preclude summary judgment.

II.     FACTS

The record establishes that the plaintiffs are Caucasian males. It is undisputed that defendant Bobby Cummings is an African-American male and has served as the Chief of the WPD at all relevant times. Plaintiff Connelly resigned from WPD on or about July 24, 2015 and sought reinstatement on or about March 30, 2016. Plaintiff Bryson retired from WPD on or about July 2, 2015 and sought reinstatement in October or November 2015. Chief Cummings was police chief from May 30, 2014 through April 13, 2017, when Bryson and Connelly applied for reinstatement. D.I. 64-15, Ex. 10, Deposition of Bobby L. Cummings ("Cummings Dep.") at 160:21-161. As Chief of Police, Chief Cummings made the decision not to rehire the plaintiffs. *Id.* at 99-100; D.I. 64-16, Ex. 11, Deposition of Clayton Smith ("Smith Dep.") at 113; D.I. 64-17, Ex. 12, Deposition of James Gestwicki, ("Gestwicki Dep.") at 55-57. Both were denied reinstatement.

The plaintiffs' alleged right to reinstatement and purported property interest is premised on Directive 5.3A of the Police Officer's Manual. The plaintiffs allege the City has a custom and practice of applying Directive 5.3A in a discriminatory manner. Directive 5.3 provides:

Reinstatement Policy.

If a former officer has applied for reinstatement after separation from the department for less than one (1) year, the conditions of employment will be as follows: that person will be required to take a physical and psychological

test, a physical agility test, be placed on one (1) year probation, and will not be eligible for a promotion for a minimum of two (2) year(sic); seniority, retirement benefits, salary grade and rank will be that of which he last served.

D.I. 64-1, Ex. 1B, Police Manual, reinstatement Policy.

The stated reason for the denial to both Bryson and Connelly was: "Unfortunately, the Department cannot offer you this position as we have already begun the process of hiring candidates for the 9th Wilmington Police Academy.  As such all vacancies for the position of police officer have been allotted to the upcoming academy."  D.I. 64-10, Ex. 4, Letter to Bryson.  During his tenure, Chief Cummings did not reinstate anyone under Directive 5.3A.  D.I. 64-15, Ex. 10, Deposition of Bobby L. Cummings ("Cummings Dep.") at 162; D.I. 64-22, Ex. 23A, Interrogatories at 6-7.  Chief Cummings's conferred with Inspector Clayton Smith and Captain James Gestwicki, commanding officer of Human Resources, in making the decision because the WPD was in the process of hiring an academy class.  D.I. 64-15, Ex. 10, Cummings Dep. at 81-82.  Chief Cummings testified "[w]hat we looked at was the fact that we were hiring a new academy class coming in and we were three-quarters of the way in the process of that."  *Id.* at 86; *see also id.* at 203-207.  Regarding the decision not reinstate, Inspector Smith testified that:

That's the direction the department decided to go in, that we were looking for officers who don't have 20 years of service, who can't retire the same day, because, like I said before, there was over a quarter of the current,—well I shouldn't say current because I'm not there.  Staffing level, that those officers can retire any given day.  I don't have it in front of me.  But I was one of those individuals. So yeah, due to the responsibility to the organization, to the community, we have to have officers there who have a good idea that they are going to be there.  We can't guarantee, like you stated earlier, that they won't drop out for any other reason, but knowing that people can retire after 20 years on any given date, it's less predictable. You can predict that those people who have 20-plus years and can leave at any given time.

D.I. 64-16, Ex. 11, Deposition of Clayton Smith ("Smith Dep." at 122-23).

The record shows that a new class of recruits was hired for the Spring 2016 Academy Class. D.I. 64-25, Ex. 25, 97th WPD Academy Timeline. The process began in January 2016. *Id.* The WPD needed 13 officers to meet authorized strength. D.I. 64-22, Ex. 23A, Interrogatories. The City hired 19 officers, allowing five additional officers to account for attrition, to attend the 97th Academy. D.I. 64-24, Ex. 24, Academy List at 2. Chief Cummings explained:

> [W]hen we hire an academy class, the academy class gets us to our authorized paid positions on the books and we're able to hire five people above that. Because we know we're going to lose some people through attrition or we may lose somebody through the academy, those individuals that are five above start to then fill in your authorized strength number. So those paid positions are then filled in by the five excess. Those five excess could also be attributed to the alternates that you select to fill in vacancies until you get to appoint that you can no longer bring anymore individuals in. So all paid positions are filled through the academy even though you're going to lose individuals through that process, which then start to impact your authorized strength by the time they graduate.

D.I. 64-15, Ex. 10 Cummings dep. at 105-07; *see also id.* at 197-200.

Cummings could not hire more than five recruits above the authorized strength. *Id.* at 107; D.I. 64-17, Ex. 12, Gestwicki Dep. at 65-68. On graduating the 97th Police Academy, the WPD was at authorized strength. D.I. 64-15, Ex. 10, Cummings Dep. at 20-24.

The City hired six white males, six black males, one white female, three black females, two Hispanic females, and one Hispanic male. D.I. 64-24, Ex. 24, Academy List. Six resided in the City of Wilmington, sixteen had college degrees, two had military experience, eight had a family legacy at the police department, and eleven were first generation police officers. *Id.*

Chief Cummings testified that in denying plaintiffs' reinstatement requests, he followed Directive 1.0, which gives authority and responsibility to the Chief to make decisions. D.I. 64-15, Ex. 10, Cummings Dep. at 186. Directive 1.2(A)(1) states:

> The Chief of Police shall exercise all lawful powers of his office and issue such orders as are necessary to assure the effective performance of the Department of Police . . . [the Police Chief] is responsible for the management of functions of planning, directing, coordinating, controlling and staffing of all activities within the Department of Police.

D.I. 64-1, Ex. 1A, WPD Manual at 2515. Chief Cummings also testified that his preference was to fill all vacant slots with cadets from the Academy. D.I. 70-2, Appendix, Cummings Dep. at A305.

Several present and former officers testified about the custom and practice of the WPD with regard to reinstatement. They largely testified that they had seen some police officers hired back and heard of others who were not re-hired. D.I. 64-18, Ex. 13, Deposition of Matthew Derbyshire ("Derbyshire Dep.") at 62-63; D.I. 64-20, Ex. 15, D.I. 64-21, Ex. 16, Deposition of Thomas L. Ragonese ("Ragonese Dep.") at 115-119, 125-127. Caro Spearman, Gary Tabor and James Gestwicki all testified that it was the WPD's custom and practice to automatically reinstate police officers. D.I. 64-20, Ex. 15, Deposition of Caro Spearman, ("Spearman Dep.") at 38-50; D.I. 64-19, Ex. 14, Deposition of Gary G. Tabor ("Tabor Dep.") at 36; and D.I. 64-17, Ex.12, Gestwicki Dep. at 99, 102-105). The record shows reinstatement is not automatic, the Human Resources Department solicited input and recommendations from supervisory officers with reference to the decision to rehire or not. D.I. 65-15, Ex. 21, H.R. records at 2355. Sergeant Ragonese testified that the manner in which Directive 5.3 was applied depended on which chief was in office, and on the input of the Inspectors and the Captain of Human Resources. D.I. 64-21, Ex. 16, Ragonese Dep. at 115-16, 125-27. He admitted that he

did not know the names of all of the police officers who had voluntarily resigned and then attempted to be rehired under Directive 5.3. *Id.* at 117-119.

Bryson himself testified that he believed the Chief had discretion on whether to rehire him or not. D.I. 64-6, Ex. 2, Bryson Dep. at 59. Bryson also stated that he did not even know that there was a policy that allowed him to reapply to the police department within one year until Inspector Smith told him about it at his walkout ceremony. *Id.* at 78-79. He stated that he was aware that some people left and came back, but he was not aware that some people were not hired back upon reapplication. *Id.* at 79-80. Connelly also testified that he was not aware that some people were not hired back upon reapplication. D.I. 64-11, Ex. 5, Deposition of Christopher Connelly ("Connelly Dep.") at 91-92. Several employees testified that they had no expectation of being rehired after resignation. D.I. 64-18, Ex. 13, Derbyshire Dep. at 62-63; D.I. 64-19, Ex. 14, Tabor Dep. at 36-40; D.I. 64-20, Ex. 15, Spearman Dep. at 38; D.I. 64-17, Ex. 12, Gestwicki Dep. at 99, 102-105; D.I. 64-21, Ex. 16, Ragonese Dep. at 115-119, 125-127.

Chief Cummings testified that Bryson and Connolly were the only two officers who requested reinstatement during his tenure as Police Chief. D.I. 64-15, Ex. 10, Cummings Dep. at 162. The record establishes that of those reinstated pursuant to Directive 5.3 prior to Chief Cummings's tenure, two were Caucasian and two were African American. Caro Spearman, a black male, was reinstated by Szczerba in 2012. D.I. 65-14, Ex. 20, H.R. records. Kevin Cooper, a black male, was reinstated by Szczerba in 2006. D.I. 65-15, Ex. 21, H.R. records. There is no evidence that Chief Connolly played any part in the reinstatements. Steven Parrot, and Patrick Malloy, both Caucasian males, were rehired

prior to 2014. D.I. 70-3, Appendix, Tabor Dep. at A483; D.I. 70-2, Appendix, Ragonese Dep. at A343, A350; D.I. 64-15, Ex. 10, Cummings Dep. at 158.

There is evidence that other police officers were denied reinstatement over the years, including Adrian Davis, a black male, who was denied reinstatement to the police department by Chief Pratcher in 1996. D.I. 73-1, Ex. 27, Affidavit of James Gestwicki; D.I. 65-12, Ex. 18, H.R. records. Richard Amsel, a white male, was denied reinstatement by Chief Szczerba in 2006. D.I. 65-13, Ex. 19, H.R. records. Although the plaintiffs contend Amsel was disabled, the record shows he had no physical or mental disabilities and was denied reinstatement because supervisors reported he was less than truthful and had a poor attitude. *Id.* Apart from Amsel and Davis, the record indicates that only five other people applied for reinstatement pursuant to Directive 5.3: Cooper, Spearman, Parrot, Malloy, and Patrolman Dorsey, an African-American male whose first name is not identified. D.I. 70-2, Appendix, Ragonese Dep. at A343-43. There is no evidence in the record that shows whether Dorsey was rehired pursuant to Directive 5.3 or reinstated as a result of an appeal of administrative discipline. *Id.*

The plaintiffs point to the reinstatement of Master Sergeant Allison Saunders, an African-American female, who was reinstated by Chief Cummings after having been involuntarily terminated, but the record shows she was reinstated after an Appeal Board decision and not pursuant to Directive 5.3. D.I. 70-2, Appendix, Cummings Dep. at A281-83; D.I. 65-17, Ex. 26, H.R. records. Chief Cummings testified that Directive 5.3 did not factor into Saunders's rehiring, because she had been fired related to disciplinary charges. D.I. 70-2, Appendix, Cummings Dep. at A283. Similarly, the record shows that Maureen Binkley, a Caucasian female was involuntarily discharged, but appealed the

decision and was reinstated.  D.I. 65-11, Ex. 17, H.R. records.  Connelly testified that he believed Officer David Yanish was reinstated, but there is no other evidence to support that testimony.  D.I. 64-11, Ex. 5, Connelly Dep. at 13-17.   Ragonese testified that someone by the name of Jeffrey McGaha, a Caucasian, was not reinstated by Cummings, but there is no other evidence of that fact.  D.I. 70-2, Appendix, Ragonese Dep. at A358.

Bryson testified Chief Cummings made a comment at roll-call that he was only going to hire women and minorities.  D.I. 70-1, Appendix, Bryson Dep. at A188. Derbyshire testified that at roll call, Chief Cummings said  "[s]omething to the effect of what you said, you know, I'm going to make it a priority to promote and transfer, you know, women and minorities, something to that effect."  D.I. 70-3, Appendix, Derbyshire Dep. at A370.   Derbyshire stated that he thought the statement demonstrated a bias against Caucasian officers, but not applicants.  *Id.*  Ragonese testified he had heard rumors that Cummings said in roll call that he was going to go out of his way to promote females and African-American males.  D.I. 70-2, Appendix, Ragonese Dep. at A356.  Connelly testified that Chief Cummings had never made such a statement in his presence, but he had heard other people say that Chief Cummings had said he would hire more minorities and women.  D.I. 64-11, Connelly Dep. at 34.

Chief Cummings acknowledged that he was looking to diversify in the WPD as to the City's demographics, meaning a cross dynamic of race, sex and ethnicity.  D.I. 70-2, Appendix, Cummings Dep. at A307.  He stated he also looked at college experience, lack of college experience, living in the city, legacies in the police department, military background and age.  *Id.* at A307-09.

Uncontroverted testimony shows that between 2014 and 2016, Chief Cummings promoted eleven Caucasian males, one African-American male, and one Caucasian female. D.I. 73-3, Ex. 29, WPD Eligibility List at 3018-19. From 2016 to 2018, Chief Cummings promoted four people: a Caucasian female, a Hispanic male, an African-American male, and a Caucasian male. *Id.* The remaining promotions during that time period were made by Chief Tracy after Chief Cummings retired. D.I. 73-3, Ex. 29, WPD Sergeant and Lieutenant Promotional System Eligibility List at 3021-22. Chief Cummings promoted two African-American men to the rank of Inspector—Clayton Smith and Elmer Harris. D.I. 70-2, Cummings Dep. at A272. He promoted a Caucasian male and an African-American male to the rank of Captain—Andrew Brock and James Gestwicki. *Id.*

Plaintiff Bryson testified that on the day of his retirement, Inspector Clayton Smith, also a black male, told him that he could come back within one year. D.I. 70-1, Appendix, Bryson Dep. at A184. Bryson stated that Chief Cummings nodded in agreement. *Id.* at A198. Bryson testified that Chief Cummings did not attend a Southbridge Civic Association meeting where Bryson was given an award. *Id.* at A192-94.

Connelly testified that shortly before he retired, he reported an Internal Affairs Division officer, Captain Brock, for driving with a suspended license. D.I. 64-11, Ex. 5, Connolly Dep. at 119-21. He was later given a written reprimanded for improper use of computer records in doing so. D.I. 65-4, Ex. 6A, Administrative Investigation documents. Other officers were also investigated and disciplined. *Id.* After that incident, he was given a one-day suspension for another infraction, failure to report a traffic accident, that had occurred prior to his reporting of captain Brock. D.I. 64-11, Ex. 5, Connolly Dep. at 101. He contends the disciplinary action was in retaliation for reporting Captain Brock. *Id.* at

101-02.  The record shows the incident was investigated before the Brock incident.  *Id.* at 101-05; D.I. 65-4, Ex. 6A.  The record shows that Connolly had been disciplined or reprimanded for other incidents during his employment.  D.I. 65-4, Ex. 6A.  There is evidence that other officers were also disciplined for various offenses but there is little similarity as to the severity of the incidents.  *Id.*; D.I. 65-10, Ex. 9B, H.R. records.

The record shows Bryson took a one-month stress reassignment in 2014 when he was placed temporarily in the Human Resources office.  D.I. 70-1, Bryson Dep. at A200; 64-6, Ex. 2, Bryson Dep. at 52; D.I. 65-3, Ex. 3F, Correspondence dated Dec. 14, 2014.  During that time, he maintained his status as a police officer.  D.I. 65-2, Ex. 3D.  A reasonable accommodation was granted for one month, and then he then went back to full time police work.  *Id.*  The defendants were aware of Bryson's anxiety in December 2014 when he made a written request to be reassigned.  *Id.* at 56.  D.I. 64-6, Ex. 2, Bryson Dep. at 52, 56; D.I. 65-3, Ex. 3F, Correspondence dated Dec. 14, 2014.  After one month, he was cleared to return to full duty.  D.I. 65-2, Ex. 3D.

Connolly testified that he felt Chief Cummings decisions were racially motived based on Chief Cummings's statements at rollcalls where he said he would hire and promote more minorities and females.  D.I. 70-1, Appendix, Connolly Dep. at A215.  Connolly also testified that he thought minority police officers were promoted or placed in specialty departments that were beyond their level of competence or experience.  D.I. 70-1, Appendix, Connolly Dep. at A218-221.

III.    LAW

   A.    Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986).  A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must supported that contention either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

   To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more

than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).  Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").  Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party.  *Anderson*, 477 U.S. at 252.

B.    Procedural Due Process

Property interests arise from independent sources such as state rules or understandings that confer specific benefits.  *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572–78 (1972).  "'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'"  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Bd. of Regents of State Colleges*, 408 U.S. at 564).  Generally, practices, policies or customs that involve considerable discretionary decision-making do

not create a legitimate claim of entitlement to employment.  *See Robb v. City of Phila.*, 733 F.2d 286, 292–93 (3d Cir. 1984) (although Pennsylvania law provides public employees with a limited right to continued employment, such employees have no legitimate claim of entitlement either to continued employment on the same job or to promotion, because those involve discretionary decisions of supervisors); *Burns v. Sullivan*, 619 F.2d 99, 104 (1st Cir.1980) (where promotions are, under state law, based in part on discretionary judgments of high city officials, no property interest in a promotion can exist); *Anderson v. City of Phila.*, 845 F.2d 1216, 1221 (3d Cir. 1988) (presence on an eligibility list alone is insufficient to create a "legitimate entitlement" triggering procedural due process protections).

      C.     Race Discrimination

Caucasian plaintiffs subjected to reverse discrimination may invoke § 1981 against defendants for the differential treatment of the plaintiffs on the basis of race.  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976).  Similarly, Title VII's terms apply equally to whites as they do to racial and ethnic minorities.  *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 967 (3d Cir. 1978).

Appellant's claims of disparate treatment under Title VII, and §§ 1981 and 1983 must be analyzed under the test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 73 (3d Cir. 2003).  Under *McDonnell Douglas*, in order to make out a prima facie case, a plaintiff must show that:  1) he or she is a member of a protected class; 2) he or she was qualified for her position; 3) he or she suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination.  *Id.*  When a

plaintiff bringing a race discrimination claim under Title VII is not a member of a racial minority and is, instead, asserting a claim for "reverse discrimination," the prima facie framework is modified such that the plaintiff must: (1) "present[ ] sufficient evidence to allow a reasonable factfinder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of [his] race," and (2) that he has suffered an adverse employment action. *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir.1999) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (noting the obvious distinction that the history of discrimination against minorities that gives rise to an inference of discrimination does not create the same inference where the plaintiff is not a minority); *see also Medcalf v. Trs. of Univ. of Penn.*, 71 F. App'x 924, 927 (3d Cir. 2003); *Coulton v. Univ. of Penn.*, 237 F. App'x 741, 747 (3d Cir. 2007). A memo promoting diversity "is not, in and of itself, sufficient to establish a prima facie case of illegal discrimination." *Id.* "An employer has every right to be concerned with the diversity of its workforce, and the work environment." *Id.* Moreover, the race of the individual responsible for a hiring decision is "insufficient to establish a prima facie case of discrimination without more." *Iadimarco*, 190 F.3d at 156; *see also Coulton*, 237 F. App'x at 747–48.

"After the plaintiff establishes a prima facie case, the defendant then must articulate a legitimate, nondiscriminatory reason for the hiring decision." *Medcalf*, 71 F. App'x at 927. "This burden 'is one of production, not persuasion; it can involve no credibility assessment.'" *Id.* (quoting *Reeves v. Sanderson*, 530 U.S. at 142).

A plaintiff can show pretext sufficient to defeat a motion for summary judgment or judgment as a matter of law by "point[ing] to some evidence, direct or circumstantial, from

which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Medcalf*, 71 F. App'x at 927 (quoting *Iadimarco*, 190 F.3d at 166). The evidence that rebuts "the employer's proffered legitimate reasons 'must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Id.* at 927-28 (quoting *Fuentes*, 32 F.3d at 765).

A plaintiff must do more than show that the defendant's proffered reason was wrong or mistaken—he must demonstrate that the defendant acted with discriminatory animus. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001). A plaintiff can meet this burden by pointing to evidence "that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). Where a plaintiff presents evidence of similarly situated non-class members to sustain his burden at the pretext stage, he

must show with some specificity that the comparators were more favorably treated.  *Id.* at 645.

E.  ADA - Perceived Disability

In order to prevail on a claim under the ADA, a claimant must prove that he is disabled within the meaning of the statute, proving that he has a physical impairment that limits a major life activity, has a record of such an impairment, or is "regarded as" having such an impairment.  *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir. 2007).  A plaintiff can only prevail if he or she shows that the employer thought the plaintiff was disabled within the meaning of the statute.  *Wilson*, 475 F.3d at 179.  To meet that standard, the plaintiff must establish that the employer mistakenly believed that the plaintiff had an impairment that substantially limits one or more major life activities or mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities.  *Id.*  The analytical framework set forth in *McDonnell Douglas* is also applied when there is an alleged violation of the ADA.  *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3rd Cir. 1996).

F.  Retaliation

The Third Circuit allows a plaintiff to "rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  "In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."  *Id.* (internal quotations marks omitted).  On the other hand, the "mere

passage of time is not legally conclusive proof against retaliation." *Id.* (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993)) (internal quotation marks omitted). A court may need to assess other factors as well—"[w]here the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." *Id.* (citation omitted). In any event, a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

The Delaware WPA provides protection against wrongful discharge to an employee who refuses to aid or commit a violation or reports the violation to the employer or a public body. 19 Del. C. § 1703. For purposes of the statute, a violation includes "an act or omission by an employer . . . that is: . . . [m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation" of the employer or by law. 19 Del. C. § 1702(6)(b). Under the Act, a plaintiff bears the burden of establishing her protected conduct was the primary basis for the retaliation. 19 Del. C. § 1708.

IV.    DISCUSSION

A.    Procedural Due Process

The Court first finds that the plaintiffs have not shown a custom or practice that would give rise to a legitimate claim of entitlement to reinstatement.  The facts do not support a finding that plaintiffs had a constitutionally protected property interest in reinstatement as police officers with the City after retirement.  The plaintiffs have not established that it was a custom or policy of the WPD to automatically allow reinstatement of retirees within one year.  Application of Directive 5.3 was sporadic and inconsistent.  Some officers were reinstated and some were not.  Numerous police officers testified that they did not believe that they had the right to automatic reinstatement.  Plaintiff Bryson himself testified that he thought Chief Cummings had discretion in deciding to reinstate an officer.  The evidence shows that officers had been denied reinstatement in the past.  Over the course of more than twenty years, only a handful of retirees sought reinstatement under the directive.  The plaintiffs have not shown that they had a legitimate claim of entitlement to be reinstated as a result of any consistently applied custom or policy.  Accordingly, the plaintiffs have no right to procedural due process under the Fourteenth Amendment and the defendants are entitled to summary judgment on the plaintiffs' procedural due process claim.

B.    Race Discrimination

Because there is no right to reinstatement, the plaintiffs arguably cannot show they suffered an adverse employment action.  But, assuming the denial of reinstatement would qualify as an adverse action, the plaintiffs have not presented evidence sufficient for a reasonable factfinder to conclude (given the totality of the circumstances) that the

19

defendant treated the plaintiffs less favorably than others because of their race so as to present a prima facie case. The plaintiffs rely on bare assertions, conclusory allegations, suspicions, and vague subjective perceptions or beliefs to support their claims.

The evidence shows that the employees who were reinstated under Directive 5.3 were reinstated by prior Police Chiefs and not by Chief Cummings. The plaintiffs place much reliance on the fact the Chief Cummings denied reinstatement to every Caucasian that applied, without acknowledging that only the two plaintiffs, both Caucasian, applied for reinstatement during Chief Cummings's tenure. There is no evidence suggesting that an African-American retiree's request for reinstatement would have been honored. The plaintiffs have not shown that others were treated more favorably because of their race so as to create an inference of discriminatory animus.

The evidence relied on by the plaintiffs in opposition to the defendants' motion has little probative value. Any statistics are meaningless in such a small sample. Out of six employees who requested reinstatement under Directive 5.3 in the past twenty-five years, four were rehired and two were not: Richard Amsel (Caucasian) and Adrian Davis (African American). Two reinstated employees were Caucasian and two were African American. There is no evidence in the record that race or disability was considered for any reapplicant. The Court can deduce no inference of discrimination for that evidence.

The defendants have propounded a legitimate, nondiscriminatory reason for the denials—filling vacancies with the incoming recruit class, who were less likely to retire suddenly and would provide continuity. The rationale appears to be a legitimate business reason for taking the action. The plaintiffs have not shown that the reason is weak, implausible, inconsistent, incoherent, or contradictory. There is no evidence to show that

the rationale is not deserving of credence. The plaintiffs have not refuted the defendants' legitimate nondiscriminatory rationale for denying the plaintiffs' requests for reinstatement.

Even if the plaintiffs had established a prima facie case of unlawful reverse discrimination, the defendants would still prevail because the plaintiffs have failed to present evidence from which a reasonable factfinder could conclude that the defendant's proffered legitimate nondiscriminatory reason for denying reinstatement is pretextual. The plaintiffs provide no evidence of racial animus. They principally rely on the Police Chief's stated desire to hire more minorities and women. That statement, however, does not necessarily reflect a discriminatory animus. The Police Chief did not state he would hire minorities and women to the *exclusion* of Caucasians, and the record shows he did, in fact, hire and promote Caucasians. Maintaining a diverse work force is a legitimate business objective. The Court divines no discriminatory animus from a stated desire to promote diversity in a police force. Nor can the Court infer a discriminatory motive in Chief Cummings's promotion of African Americans to high ranking posts, without some showing that the officers were somehow unqualified. On this record, there is no evidence from which a reasonable jury could conclude that the plaintiffs were treated less favorably because they are Caucasian. The plaintiffs' evidence, when considered in conjunction with the uncontested evidence presented by the defendants, falls far short of the quantum of proof necessary for a "reasonable factfinder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of [his] race." *Iadimarco*, 190 F.3d at 163.

Similarly, the plaintiffs did not present evidence that shows a genuine issue of fact on either disability discrimination or retaliation. They did not present evidence beyond subjective beliefs and conjecture that the asserted reasons for the denials of reinstatement were a pretext for unlawful motives.

The record shows Connolly received appropriate discipline for a violation of policy. He did not dispute or challenge the discipline at the time. The instigation of the investigation of his failure-to-report incident pre-dated the incident that allegedly triggered retaliation. He cannot rely on any temporal connection to show causation. Connolly has not shown that any retaliation was the result of his engaging in a protected activity.

Bryson's one-month reassignment to desk duty did not affect the terms of his employment or retirement in any way. The record shows he received a reasonable accommodation. As for reinstatement, he arguably did not suffer any adverse employment action since he had no right to reinstatement. Even if he did, he has not produced evidence sufficient to rebut Chief Cummings's proffered nondiscriminatory rationale for the denial of reinstatement. He has not shown that his perceived disability was the motivation for denial of his request for reinstatement.

There is not sufficient evidence before the court to allow a reasonable factfinder to disbelieve the employer's articulated legitimate reason, because there is no evidence in the record that casts doubt on the plausibility of the reason. Contrary to the plaintiff's assertions, there are nondiscriminatory reasons for preferring a new recruit class to fill vacancies, rather than retirees. There is insufficient evidence from which a reasonable factfinder could conclude that either retaliation for a protected activity or disability discrimination motivated Chief Cummings's denial of reinstatement.

In light of this disposition, the Court need not address the municipal liability and qualified immunity issues.

THERFORE, IT IS ORDERED THAT:

1. Defendant Cummings's motion for summary judgment (D.I. 60) is granted.

2. Defendant City of Wilmington's motion for summary judgment (D.I. 61) is denied.

3. Defendants' motions to extend time (D.I. 80 and 81) are denied as moot.

4. The parties' motions in limine (D.I. 83, 84, 85, 89, 90 and 91) are denied as moot.

5. A judgment of dismissal in accordance with this Memorandum and Order will issue this date.

Dated this 11th day of January 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge